[Civ. No. 20329. First Dist., Div. Two. Oct. 4, 1962.]

ELVIRA O'REILLY, Plaintiff and Appellant, v. ADRIAN J. ORRADRE et al., Defendants and Respondents.

Courtney L. Moore for Plaintiff and Appellant.

Raymond W. Shellooe for Defendants and Respondents.

AGEE, J.—Plaintiff appeals from an adverse judgment in an action to enforce an alleged executed parol agreement to partition land and to quiet title thereto. ▆ The determinative issue on appeal is whether the trial court's finding that the parties had not entered into any such agreement is supported by the evidence. We find that it is. The facts as disclosed by the record follow.

Miguel and Marianne Orradre were the parents of Elvira O'Reilly (plaintiff), Adrian J. Orradre (a defendant), and Michel Orradre.[1] In 1935, they executed two deeds by which they conveyed their ranch lands in Monterey County to their children, reserving life estates in themselves. One deed con-

---

[1] In 1939, Michel deeded his interest in the subject property to Adrian and he is not a party herein.

veyed parcels comprising 1,998.79 acres to Elvira. The other deed conveyed the remaining lands to Adrian and Michel and included a 360-acre tract known as the "Collins property." This tract is the subject of this litigation.

In 1927, some eight years before, Miguel had, by a codicil to his will, devised the Collins property and three other tracts to Elvira. Upon his death in 1936, his will and codicil were admitted to probate. The final decree of distribution (incorrectly) recited that all of the lands described in the devise to Elvira had been conveyed to her prior to Miguel's death. The decree did not purport to distribute any of the lands conveyed under either of the two 1935 deeds.

Miguel died in 1936. In 1938, his widow, Marianne, deeded to Adrian, Michel and Elvira, her life estate interest in the properties which had been respectively conveyed to them in 1935.

In 1939, Elvira orally leased her 1,998.79 acres to one Lanigan for cattle grazing purposes. The property was unfenced. Adrian and Michel were raising sheep and, when Lanigan's cattle began to wander onto their property, Adrian objected. Elvira and Adrian discussed the matter and made a trip into the area together. This is located in the San Ardo district and the terrain is rugged. They stood on a high ridge overlooking the property and orally agreed that a drift fence should be placed along the line of the ridge rather than to have it follow the actual boundary line, which did not follow the contours but ran straight through canyons and ravines. This arrangement made the fence less expensive while serving the same purpose, which was to keep the cattle from straying. The fence line agreed upon ran through the Collins tract. Elvira erected the fence at her own expense. For the next 19 years, Elvira and her lessee used the portion of the Collins property on "her side" of the fence for cattle grazing. Adrian has paid the taxes on the subject property since 1938.

In 1957, Adrian conveyed his lands, including the Collins tract, to his daughter and her husband, defendants Denise and Floyd Grigory. In 1958, Floyd removed the fence and put up a new one along the boundary line between the Collins tract and the property which had been conveyed to Elvira by her father and mother under the 1935 deed.

Elvira thereupon brought his action against Adrian, Floyd and Denise. The judgment quieted the title to the Collins tract in Floyd and Denise.

The trial court found that there was never any dispute between Elvira and Adrian as to the ownership of the Collins property and that Elvira never at any time claimed such ownership; further, that Adrian did not at any time settle any dispute with Elvira relating to the ownership of the Collins property or agree with her to a division or partition thereof; that in December 1939, they agreed to the location of a fence along the ridge of lands mostly owned by Adrian, which fence was to be constructed by Elvira for the purpose of preventing Lanigan's cattle from trespassing upon Adrian's lands; that it was not agreed by Adrian and Elvira that the Collins tract was to be so divided that the portion to the south and east of the proposed fence was to be hers and the portion to the north and west thereof should be Adrian's.

Lanigan testified that when he talked to Elvira about leasing her property he told her that he could not very well use it for cattle if it were not fenced; that when his cattle strayed onto Adrian's property, Adrian brought the matter to his attention and he took it up with Elvira; that "I spoke to her about why not get a quick fence, what we call a drift fence, that could be built shortest and easiest possible way to keep my cattle in and she said she would go and see her brother about it"; that Elvira later told him that she and her brother had been up on the ridge and "decided about where to put this drift fence"; that the next Sunday he and Elvira rode horses out to the site and Elvira told him that her brother "had said [to] build it along down approximately on top of the Ridge the quickest and easiest place that could be built"; that although his cattle grazed up to the drift fence, none of the Collins property was ever leased by him.

Lanigan also testified that he had lived in the San Ardo area for 73 years and that it was the custom to "give and take; see, build a fence where it's easiest and quickest. If you build a fence on the surveyed lines you go across ravines and angling up across sides of hills and taking hill pieces of canyons and then angling back again and it cuts it all up and cattle get in pockets where they can't get out and can't get water. . . . You can take your fence down if you ever wish to put it on the line and get the line surveyed and the survey is agreed to by both parties, you can take that fence down and fence it on the line."

Elvira testified that she and Adrian "decided to ride up to the site so we could both determine just where we were going to fence from"; that "we were to put up a fence

so that Ade's stock would stay on his side and our stock could stay on our side''; that her brother said that ''he was letting me put the fence where it was easiest to put, which included the Collins property, said it was a mix-up in the attorney's office of some sort that it wasn't in the deed''; that he said, ''Well, I am letting you put the fence where it is easiest on the stock.''

Adrian testified that more than two hundred head of Lanigan's cattle were running over eight or nine thousand acres of his property and that he told Elvira that she ''had to do something about those cattle, build a fence or keep them away best we could, so she came down one Sunday and came down on my place, Pancho Rico, had dinner, and then after dinner—in the meantime at dinner I asked her let's go see where the best place we can build a fence to keep the cattle from going from there over here, which we did. We took a pickup and we drove clear up there, Saddle, as far as we could with the pickup and stood there for a few minutes and looked around. Well, I said, 'Don't you think you best make a fence right straight through here on top of the Ridge, quickest way, temporary fence to keep those cattle out of the way?' And she said, 'Yes, I think that would be the quickest way to do it.' ''

The following answers were then given to the following questions: ''Q. Now, when you—was anything more said between you and your sister, Mrs. O'Reilly, when you were standing up there in the Saddle about the fence or about anything? A. No, there was nothing else said about it, going to go at it soon as she could, that's all. Q. Was there anything said about who was to be the owner of the property on either side of the fence? A. Nothing said about it. Q. At any time did Mrs. O'Reilly, your sister, tell you she should have gotten the Collins property? A. Never mentioned it.''

One of the theories alleged in plaintiff's complaint is that her brothers had conspired to defraud her of the Collins tract by obtaining the 1935 deeds from their infirm father, then not advising her of them, and representing to the probate court during distribution of the father's estate that the tract had already been conveyed to her. The trial court found against the plaintiff in all of the particulars alleged by her in support of this theory and the matter is not pursued on this appeal. However, in fairness to the attorney in the probate proceedings, it should be noted that the only purpose of the recitals in the petition and decree, to the effect that

all of the real property devised by decedent had been conveyed by him prior to his death, was to inform the court of the reason why such real property was not being distributed under the decree. The statements therein that the Collins property had been conveyed to Elvira in accordance with the 1927 codicil were incorrect but were not made with any intent to defraud.

We are aware that the facts have been related herein in the light most favorable to respondents and that we have not discussed the legal effect of what appellant terms "an executed parol agreement partitioning land." Such discussion would be necessary only if the trial court had found that the parties had made any such agreement. Judgment affirmed.

Kaufman, P. J., and Shoemaker, J., concurred.